**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| **Plaintiff,** | ) |
| v. | ) |
| | ) |
| **FABRIZIO NEVES and** | ) |
| **JOSE LUNA,** | ) |
| | ) |
| **Defendants.** | ) |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Securities and Exchange Commission alleges as follows:

## I.   INTRODUCTION

1.      From November 2006 to September 2009, Defendants Fabrizio Neves and Jose Luna engaged in a scheme to fraudulently mark up prices of approximately $70 million in structured notes issued by major commercial banks, charging approximately $36 million in undisclosed excessive fees to their brokerage customers: two Brazilian public pension funds and a Colombian institutional investor. Neves and Luna were both registered representatives associated with the now-defunct Miami, Florida broker-dealer LatAm Investments, LLC ("LatAm").

2.      In eight transactions between July 2008 and September 2009, Neves negotiated the structuring of the notes on his customers' behalf. The banks issued the structured notes at a certain price and Neves purchased them at that price into LatAm's trading account. But Neves did not directly sell the notes to the customers at or close to the issuer's price. Instead, Neves first traded the notes with one or more nominee accounts he, Luna and others controlled. Neves,

with Luna's assistance, then repurchased the notes from these nominee accounts into LatAm's trading account at dramatically increased prices, resulting in windfall profits to Neves, Luna, and the others who controlled the nominee accounts. Finally, Neves and Luna marked up the prices of the structured notes again, and arranged for the Brazilian Funds or, in one instance, the Colombian institutional investor, to purchase the notes at prices as much as 67 percent over the prices at which the banks had issued them.

3.      In four other transactions between November 2006 and May 2007, Neves and Luna improperly boosted the prices of the structured notes by selling them to the Brazilian funds at excessive markups up to 36 percent more than the prices at which the banks had issued the notes that same day.

4.      As a result of the Defendants' markup scheme, the Brazilian funds paid a total of approximately $24 million in undisclosed, excessive fees and the Colombian institutional investor paid more than $12 million in undisclosed, excessive fees.

5.      Through their conduct, the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5; Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a).   They also and aided and abetted LatAm's violations of Exchange Act Section 15(c), 15 U.S.C. § 78o(c).   Unless the Court enjoins the Defendants, they are reasonably likely to continue to violate these laws.

## II. DEFENDANTS

6.      **Neves**, age 43, is a Brazilian citizen and resident, and maintains a residence in Miami, Florida.   From approximately May 2006 until November 2009, Neves was a part owner of and registered representative associated with LatAm.   Neves originally purchased a 1

2

percent ownership interest in LatAm for $350,000, though he intended to acquire a 75 percent interest.  Neves also owns 90 percent of Atlantica Administradora De Recursos Ltda., a/k/a Atlantica Investimentos ("Atlantica Asset Management"), a non-registered, Brazilian-based portfolio management company.  Neves held Series 7 and 66 securities licenses.  In May 2010, FINRA barred Neves, by consent, from association with any FINRA member firm in any capacity based on his failure to provide requested documents in connection with FINRA's investigation of some of the conduct alleged in this complaint.

7.      **Luna**, age 45, resides in Aventura, Florida.  In May 2006, Neves hired Luna to join LatAm as a back office operations employee.  In May 2008, Luna obtained his Series 7 license and subsequently worked as Operations Manager at LatAm, assisting Neves in trading on behalf of the two Brazilian funds, until he left in December 2009.

### Relevant Entity

8.      **LatAm** is a Florida Limited Liability Company formed in 2004. During the period at issue in this complaint, LatAm had its principal place of business in Miami, Florida. LatAm was registered as a broker-dealer in October 2004 under the name Acosta Financial Services, Inc., and changed its name to LatAm in October 2007.  LatAm filed a Form BD-W, withdrawing its registration with the SEC, effective on April 27, 2010.

### III.   JURISDICTION AND VENUE

9.      In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.  More specifically, Neves negotiated the terms of the structured notes using the telephone to communicate with bankers located in New York, London,

England, and other places outside of Florida. In at least one instance, Neves received by email a term sheet for a structured note later fraudulently sold to one of the three customers. Luna emailed the forged term sheets to a recipient in Brazil and participated with Neves in at least one of the telephone calls to negotiate the terms of the structured notes that are the subject of the allegations of this complaint. In addition, Neves and Luna caused funds to be transferred by wire to and from certain of the accounts used to mark up the notes' prices in several of the transactions described in this complaint.

10.     The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d) and 77v(a); and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

11.     The Court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Florida, because many of the Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida, as described throughout this complaint. Neves and Luna resided in the Southern District of Florida during the period when the alleged conduct occurred. In addition, LatAm was a Florida limited liability company with its primary place of business in the Southern District of Florida during the period the allegations in this complaint occurred.

### IV.  THE DEFENDANTS' FRAUDULENT INVESTMENT SCHEME

#### a.  The Defendants' Relationship With Each Other And LatAm

12.     In May 2006, Neves joined LatAm as a registered representative and acquired a 1 percent ownership interest in the firm. At that time, Neves also was an owner of Atlantica Asset Management, a Brazilian investment adviser. Atlantica Asset Management served as the portfolio manager for the Brazil Sovereign II FIDEX Fund ("Brazil Sovereign Fund") and the

Atlantica Real Sovereign Fund ("Atlantica Fund") (collectively, "the Brazilian Funds") and, as such, was authorized to make all trading decisions on behalf of the funds. The sponsor of the Brazilian Funds is Postalis, a pension fund for postal workers in Brazil. Neves was friends with a senior officer of Postalis. The Brazilian Funds were Neves' brokerage customers since at least 2005, before he joined LatAm. Neves brought the Brazilian Funds with him to LatAm as customers. Thus, through his role with Atlantica Asset Management, Neves had discretion over the two public pension funds' accounts while also serving as the accounts' registered representative at LatAm.

13.     The Brazilian Funds immediately became LatAm's largest customers and generated the vast majority of the firm's revenues through the trading of bonds and structured notes. Before Neves brought the Brazilian Funds' business to LatAm, the firm's revenues were minimal: only $34,803 in 2005. After Neves joined the firm and began trading for the Brazilian Funds, LatAm reported revenues of approximately $58.7 million from January 1, 2007 through November 30, 2009.

14.     Neves and Luna met in 2003 when Neves began working at another broker-dealer where Luna was employed. In about 2005, Neves left that broker-dealer and hired Luna to work for him processing trades for the Brazilian Funds. When Neves left and bought an interest in LatAm in 2006, he hired Luna to assist him there with back office operations. After he joined LatAm, Neves also caused LatAm to hire three Brazilian associates of his as foreign associates. The three, all of whom were Brazilian residents, also were associated with Atlantica Asset Management.

**b.  Structured Note Transactions in 2006 and 2007 Involving Same Day Excessive Markups**

15.     In a typical structured note transaction, the customer requests that the broker-

dealer customize a note with an issuer, typically an investment bank, to meet the customer's particular needs.   The issuer prepares a term sheet setting forth the relevant terms of the transaction, including pricing information.   The term sheet contains what is referred to, variously, depending on the issuer, as a notional amount, principal amount, or nominal amount (hereinafter "notional amount").   The issuer's sale price is calculated as a percentage of the note's notional amount. The broker-dealer typically will purchase the note into its firm's riskless principal account at the issuer's sale price and then sell it to the customer.   The broker-dealer's commission in connection with the structured note transaction is reflected in a markup or markdown (if the broker-dealer's customer is selling) added to the price of the security.

16.      In at least four structured note transactions on behalf of the Brazilian Funds between November 2006 and May 2007, Neves charged undisclosed excessive same-day markups.  (See table detailing the four transactions, below).   Specifically, LatAm, at Neves' direction, purchased each of the structured notes directly from the issuer into the firm's riskless principal account and, on the same day, sold the note to one of the Brazilian Funds with the price marked up between 18 and 36 percent.

| ISIN # and Notional Amount ("NA") | Date of Transactions | LatAm's Purchase Price (percent of NA) | Sale Price to Customer (percent of NA) | Markup percent | Total Markup Amount |
|---|---|---|---|---|---|
| XS0275931607 $10,000,000 | 11/14/2006 | 50.89 percent | 60 percent | **18 percent** | $910,950 |
| XS0283887486 $12,000,000 | 1/17/2007 | 53 percent | 64 percent | **21 percent** | $1,319,950 |
| US105756AL40 $12,000,000 | 4/4/2007 | 70 percent | 95 percent | **36 percent** | $3,000,000 |
| XS0304195026 $7,500,000 | 5/29/2007 | 80 percent | 100 percent | **25 percent** | $1,500,000 |

17.      Neves had no reasonable basis to  mark up the prices of the notes  that much.  His markups were excessive because: (1) Neves made the markups on the same day the issuer set the

price; (2) there was no secondary market for the notes; and (3) there were no significant intervening market events that day.   The same-day markups charged to the Brazilian Funds in these four transactions resulted in undisclosed excess charges of approximately $6.7 million.

### c.   Fraudulent Structured Note Transactions in 2008 and 2009 Involving Nominee Accounts

18.     In eight transactions between July 2008 and September 2009, Neves used one or more accounts of offshore nominee entities as intermediaries to generate the excessive markups (and in one transaction, an excessive markdown).   The intermediary accounts used in the eight intermediary transactions were controlled by Neves, Luna, or their relatives or associates.   In each transaction, Neves first negotiated the terms of the structured notes with the issuers, as requested by the Brazilian Funds or the quasi-public Colombian institutional investor, the Corporacion Autonoma Regional de Valle del Cauca ("CVC").   Once Neves finalized the terms of the notes, he purchased them into LatAm's riskless principal account.   Thereafter, Neves directed Luna to fill out order tickets to trade seven of the notes with one or more offshore nominee accounts, who held the notes for short periods of time, before selling the notes back to LatAm at a marked up price Neves selected.   The intermediary accounts Neves and Luna or their associates controlled received windfall profits from the quick re-sale of the notes at the marked up prices Neves set.   Neves and Luna then executed sales of the notes from LatAm's riskless principal account to the Brazilian Funds or the CVC at prices between 19 and 67 percent higher than the price the issuer had set.

19.     In one example, on July 6, 2009 Neves purchased a structured note with ISIN # XS0439509240 and a $10,000,000 notional amount at a price of 37 percent of the note's notional amount.   He purchased the note into LatAm's trading account.   That same day, Neves and Luna executed the re-sale of the note to River Consulting, Inc. at a price of 47 percent of its

notional amount.  River Consulting is a shell company incorporated in the British Virgin Islands. The company is registered in the name of Neves' mother-in-law and he controlled it.

20.     On July 24, 2009, Neves and Luna executed the re-sale of the July 6, 2009 note by River Consulting to LatAm at price of 59.95 percent of its notional amount.  That same day, Neves and Luna executed a sale of the note from LatAm's account to one of the Brazilian Funds at a price of 60 percent of its notional amount.  In this transaction, the Brazilian Fund paid $6,000,000 for the note, including a 62 percent markup of $2,300,000.  Neves' River Consulting account profited by nearly $1,300,000.

21.     Neves and Luna used River Consulting as an intermediary in five of the eight note transactions involving intermediary accounts.  These five transactions involved structured notes issued in: July 2009 with ISIN # XS0439509240, described above; July 2009, with a notional amount of $3,000,000 with ISIN Number XS0439257766; July 2009, with a notional amount of $12,000,000 with ISIN Number XS0295805708; August 2009, with a notional amount of $8,500,000 with ISIN number XS0445230781; and August 2009, with a notional amount, in Brazilian reals, of R$53,747,700 with ISIN number XS0449348688.  Neves and Luna marked up the prices of these five structured notes to include undisclosed excessive markups, and a markdown, of between 19 and 67 percent.  Neves and Luna charged the markups and markdown to the Brazilian Funds.

22.     In two of the eight transactions involving at least one intermediary, Neves and Luna used an offshore account in the name of Spectra Group Holding, Ltd. to conceal excessive markups on two notes: one issued in July 2008 with a notional amount of $7,168,000 with ISIN number XS0378810823; the other issued in August 2009 with ISIN number XS0449348688, as described in the previous paragraph.  Spectra Holding was a British Virgin Islands corporation

registered to an entity named Spectra Trust.  The settlor and primary beneficiary of the Spectra Trust is also a senior officer of Postalis (the same officer referred to in paragraph 12, above), the sponsor of the Brazilian Funds.

23.     The other  two fraudulent transactions using intermediary accounts involved structured notes issued in November 2008 with a notional amount of $50,000,000 with ISIN number SX0401826754; and December 2008 with a notional amount of $10,000,000 with ISIN number SX0402114200.

#### d. To Conceal The Markup Scheme, Neves And Luna Provided Forged Term Sheets To Customers

24.     In at least six instances, Neves and Luna  concealed the excessive markup scheme by altering the original term sheets provided to LatAm by the notes' issuers, either by inflating the original price, or removing the pricing information altogether.  Neves told Luna what prices to use, made sure the price on the altered term sheet and the order ticket matched, and approved the alterations before Luna sent them to the Brazilian Funds representatives or the CVC.   Luna used "white out" or electronic "cut and paste" to change or omit the original term sheets' pricing information.

25.     For example, Luna emailed Atlantica Asset Management, the manager for the Atlantica Fund, an altered term sheet for the July 6, 2009 note described above that misrepresented the issue price was 60 percent of its notional amount.   Atlantica Asset Management, in turn, provided a copy of the term sheet with the 60 percent price to the administrator for the Brazilian Funds.  The issuer's original term sheet, however, had listed the issue price as 37 percent of its notional amount.  Neves and Luna altered the pricing information on the term sheet to conceal the structured note's lower issue price from the Brazilian Funds' administrator.

26.     In another example, at Neves' direction, Luna changed the original term sheet pricing information and sent an altered term sheet to Atlantica Asset Management for a Brazilian real denominated structured note issued on August 25, 2009, as described above.  The term sheet Luna altered and transmitted inflated the note's original issue price from 27.91 percent of its notional amount in Brazil reals to 47.5 percent of its notional amount in reals.   In a third example, Neves directed Luna to alter a term sheet for a note issued on November 24, 2008, with a notional amount of $50,000,000, so it contained an issue price of 53.27 percent of the notional amount.  The original term sheet the note's issuer sent to Luna includes an issue price of 32.90 percent of the note's notional amount.  Neves and Luna provided the altered term sheet to the CVC.

### e.   The Defendants Received Millions in Ill-Gotten Gains From Their Scheme

27.     During the period the above-described fraud was ongoing, LatAm paid Neves millions of dollars in inflated sales commissions for the structured note transactions made at inflated prices.  During the same period, Luna received hundreds of thousands of dollars in salary and commissions from LatAm, and tens of thousands of dollars in additional compensation Neves paid him from a company Neves controlled.

## V.  CLAIMS FOR RELIEF

## COUNT I

### Fraud In Violation of Section 10(b) and Rule 10b-5 of the Exchange Act
### (Against Both Defendants)

28.     The Commission repeats and realleges paragraphs 1 through 27 of its Complaint.

29.     Starting no later than 2006, Neves and Luna directly or indirectly, by use of the

means and instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

30.     By reason of the foregoing, the Defendants directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

## COUNT II

### Fraud In Violation of Section 17(a)(1) of the Securities Act
### (Against Both Defendants)

31.     The Commission repeats and realleges paragraphs 1 through 27 of its Complaint.

32.     Starting no later than 2006, Neves and Luna directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly or recklessly employed devices, schemes or artifices to defraud.

33.     By reason of the foregoing, the Defendants directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(l) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### Fraud In Violation of Section 17(a)(2) and (3) of the Securities Act
### (Against Both Defendants)

34.    The Commission repeats and realleges paragraphs 1 through 27 of its Complaint.

35.    Starting no later than 2006, Neves and Luna directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails: (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

36.    By reason of the foregoing, the Defendants directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and (3).

## COUNT IV

### Aiding and Abetting LatAm's Violations of Section 15(c) of the Securities Exchange Act
### (Against Both Defendants)

37.    The Commission repeats and realleges paragraphs 1 through 27 of its Complaint.

38.    Starting no later than 2006, Neves and Luna aided and abetted LatAm Investments LLC's violations of Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c), by using the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities: (a) by means of a manipulative, deceptive, or other fraudulent device or contrivance, and (b) in connection with which LatAm Investments LLC engaged in a fraudulent deceptive, or manipulative act or practice.

39.    By reason of the foregoing, Neves and Luna aided and abetted LatAm Investments LLC's violations and, unless they are enjoined, are reasonably likely to continue to directly or indirectly violate Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine, and find that the Defendants have committed the violations of the federal securities laws alleged in this Complaint.

### II.

### Permanent Injunctive Relief

Issue permanent injunctions pursuant to Rule 65(d) of the Federal Rules of Civil Procedure enjoining: the Defendants, their agents, servants, employees, attorneys, representatives, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5; Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c).

### III.

### Disgorgement

Issue an Order directing the Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## IV.

## **Penalties**

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

## V.

## **Further Relief**

Grant such other and further relief as may be necessary and appropriate.

## VI.

## **Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

August 29, 2012                               By:_____
                                              Edward D. McCutcheon
                                              Senior Trial Counsel
                                              Florida Bar No. 683841
                                              Direct Dial:  (305) 982-6380
                                              E-mail: mccutcheone@sec.gov
                                              *Lead Attorney*

                                              Laura R. Smith
                                              Senior Counsel
                                              SDFL CM/ECF ID: A5501349
                                              California Bar No. 205159
                                              Direct Dial: (305) 982-6387
                                              Email: smithla@sec.gov

*Attorneys for Plaintiff*
**SECURITIES AND EXCHANGE**
**COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida  33131
Telephone: (305) 982-6300
Facsimile:   (305) 536-4154