# REQUEST FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS PURSUANT TO THE ADDITIONAL PROTOCOL TO THE INTER-AMERICAN CONVENTION ON LETTERS ROGATORY

**FORM A**

## LETTER ROGATORY [1]

| 1 | 2 |
|---|---|
| **REQUESTING JUDICIAL OR OTHER ADJUDICATORY AUTHORITY**<br><br>Name U.S. District Court, Southern District of Florida<br><br>Address Line 1: Hon. Ursula M. Ungaro<br>Address Line 2: Miami Federal Courthouse<br>Address Line 3: 301 N. Miami Ave.<br>Address Line 4: Miami, Florida, 33128 | **PLAINTIFF:** Securities and Exchange Commission<br>\v.<br>**DEFENDANT:** Fabrizio Neves<br><br>DOCKET No:<br>**1:12-cv-23131-UNGARO** |
| 3 | 4 |
| **CENTRAL AUTHORITY OF THE STATE OF ORIGIN**<br><br>Name: Office of International Judicial Assistance<br><br>Address Line 1: Civil Division, Department of Justice<br>Address Line 2: Todd Building, Room 1234<br>Address Line 3: 550 11th Street, N.W.<br>Address Line 4: Washington, D.C. 20530 | **CENTRAL AUTHORITY OF THE STATE OF DESTINATION**<br><br>Name: Ministério da Justiça<br><br>Address Line 1: Esplanada dos Ministérios<br>Address Line 2: bl. T, 4 Andar, sl. 424,<br>Address Line 3: 70000-900, Brasília, DF<br>Address Line 4: BRAZIL |
| 5 | 6 |
| **REQUESTING PARTY**<br><br>Name: U.S. Securities & Exchange Commission<br><br>Address Line 1: 801 Brickell Avenue<br>Address Line 2: Suite 1800<br>Address Line 3: Miami, FL 33131<br>Address Line 4: | **COUNSEL TO THE REQUESTING PARTY**<br><br>Name: N/A<br><br>Address Line 1:<br>Address Line 2:<br>Address Line 3:<br>Address Line 4: |

**PERSON DESIGNATED TO ACT IN CONNECTION WITH THE LETTER ROGATORY**

Name:
Edward D. McCutcheon, Esq.

Address Line 1: Securities and Exchange Commission
Address Line 2: 801 Brickell Avenue, Suite 1800
Address Line 3: Miami, Florida 33131
Address Line 4:

Is this person responsible for costs and expenses?
Yes ☐   No ☑
If not, check in the amount of $ 25.00
is attached.
(Or proof of payment is attached.)

[1] Complete the original and two copies of this form; if A (1) is applicable, attach the original and two copies of the translation of this item in the language of the State of destination.

The Central Authority signing the letter rogatory has the honor to transmit to you in triplicate the documents listed below and, in conformity with the protocol to the Inter-American Convention on Letters Rogatory:

* A.   Requests their prompt service on:

**Fabrizio Neves**

QI7, Conjunto 4, casa 10, Lago Sul Brasilia - FF, CEP 71615-240

The undersigned authority requests the service be carried out in the following manner:

* (1) In accordance with the special procedure or additional formalities that are described below, as provided for in the second paragraph of Article 10 of the above mentioned Convention; or

* (2) By service personally on the identified addressee or, in the case of a legal entity, on its authorized agent; or

* (3) If the person or the authorized agent of the entity to be served is not found, service shall be made in accordance with the law of the State of destination.

* B.   Requests the delivery of the documents listed below to the following judicial or administrative authority:

Authority: _____

* C.   Requests the Central Authority of the State of destination to return to the Central Authority of the State of origin one copy of the documents listed below and attached to this letter rogatory, and an executed Certificate of the attached Form C.

Done at _____ this _____ date of _____, 20___

_____
Signature and stamp of the
judicial or other adjudicatory
authority of the State of origin

Signature and stamp of the
Central Authority of the
State of origin

Title or other identification of each document to be delivered:
Summons, Complaint and Order Setting Initial Planning and Scheduling Conference.

(Attach additional pages, if necessary)
*Delete if inapplicable

2

### ANNEX TO THE ADITIONAL PROTOCOL
### TO THE INTER-AMERICAN CONVENTION OF LETTERS RAGOTORY

FORM B [1]

### ESSENTIAL INFORMATION FOR THE ADDRESSEE [1]

To (Name and address of the person being served)  Fabrizio Neves
Ql7, Conjunto 4, casa 10, Lago Sul Brasilia - FF, CEP 71615-240

You are hereby informed that (Brief statement of nature of service)  A lawsuit has been
filed against you in the United States District Court, Southern District of Florida, alleging
violations of the securities laws of the United States of America.

    A copy of the letter rogatory that gives rise to the service or delivery of these
documents is attached to this document. This copy also contains essential information
for you.  Also attached are copies of the complaint or pleading initiating the action in
which the letter rogatory was issued, of the documents attached to the complaint or
pleading, and of any rulings that ordered the issuance of the letter rogatory.

### ADDITIONAL INFORMATION
### I*
### FOR SERVICE

A.  The document being served on you (original or copy) concerns the following:
Complaint, which initiates a lawsuit against Fabrizio Neves.  Summons, which sets the deadline
to answer the lawsuit.  Order setting initial planning and scheduling conference, which orders
the parties to appear before the Court on Friday, November 16, 2012, at 10:00 a.m.

B.  The remedies sought or the amount in dispute is as follows:
If you fail to respond, judgment by default will be entered against you for the relief
demanded in the complaint.

C.  By this service, you are requested:
To file an Answer to the Complaint, which must be served on Plaintiff 21 days from
service of Complaint and Summons.

D.  * In case of service on you as a defendant you an answer the complaint before
the judicial or other adjudicatory authority specified in Form A, Box 1 (State
place, date and hour):  An Answer to the Complaint must be served on Plaintiff 21 days
from service of Complaint and Summons.

    * You are being summoned to appear as:  as a defendant in a civil matter.

  [1] Complete the original and two copies of this form in the language of the State of
origin and two copies in the language of the State of destination.
    * Delete if applicable.

3

\*   If some other action is being requested of the person served, please describe: _____

_____

_____

_____

E.   If you fail to comply, the consequences might be: _____

   If you fail to respond, judgment by default will be entered against you for the relief

   demanded in the Complaint.

_____

F.   You are hereby informed that a defense counsel appointed by the Court or the Following legal aid societies are available to you at the place where the proceeding is pending.

Name: _____

Address: _____

_____

The documents listed in Part III are being furnished to you so that you may better understand and defend your interests.

## II \*
## FOR INFORMATION FROM JUDICIAL OR ADMINISTRATIVE AUTHORITY

To: _____

_____

_____

(Name and address of the judicial or administrative authority)

You are respectfully requested to furnish the undersigned authority with the following information.

_____

_____

_____

The documents listed in Part III are being furnished to you to facilitate your reply.

\*Delete if inapplicable.

4

**III**
**LIST OF ATTACHED DOCUMENTS**

Summons [English]
Summons [Portuguese]
Complaint [English]
Complaint [Portuguese]
Order Setting Initial Planning and Scheduling Conference [English]
Order Setting Initial Planning and Scheduling Conference [Portuguese]

_(Attach additional pages if necessary)_

Done at _____ this _____ day of

_____ , 20 _____

Signature and stamp of the
judicial or other adjudicatory
authority of the State of origin

Signature and stamp of
the Central Authority
of the State of Origin

5

**ANNEX TO THE ADDITIONAL PROTOCOL
TO THE INTER-AMERICAN CONVENTION ON LETTERS ROGATORY**

FORM C

CERTIFICATE OF EXECUTION [1]

To: _____

_____

_____

(Name and address of judicial or other adjudicatory authority that issued the letter rogatory)

In conformity with the Additional Protocol to the Inter-American Convention on Letters Rogatory, signed at Montevideo on May 8, 1979, and in accordance with the attached original letter rogatory, the undersigned Central Authority has the honor to certify the following:

\*    A.   That one copy of the documents attached to this Certificate has been served or delivered as follows:

Date: _____

At (Address) _____

By one of the following methods authorized by the Convention.

\* (1)   In accordance with the special procedure or additional formalities that are described below, as provided for in the second paragraph of Article 10 of the above mentioned Convention, or

_____

_____

\* (2)   By service personally on the identified addressee or, in the case of a legal entity, on its authorized agent, or

\* (3)   If the person or the authorized agent of the entity to be served was not found, in accordance with the law of the State of destination; (Specify method used)

_____

_____

_____

_____

[1] Complete the original and one copy in the language of the State of destination.
\*Delete if inapplicable

6

*    B.  That the documents referred to in the letter rogatory have been delivered to:

Identity of person  _____

_____

_____

Relationship to the addressee  _____

(Family, business or other)

_____

_____

*    C.  That the documents attached to the Certificate have not been served or delivered for the following reason(s):

_____

_____

_____

*    D  In conformity with the Protocol, the party requesting execution of the letter rogatory is requested to pay the outstanding balance of costs in the amount indicated in the attached statement.

Done at  _____ the _____ day of _____ 20___

_____
(Signature and stamp of Central Authority of the State of destination)

Where appropriate, attach originals or copies
of any additional documents proving service
or delivery, and identify them

*Delete if inapplicable

7

**PEDIDO DE EXECUÇÃO NO ESTRANGEIRO DE DOCUMENTOS JUDICIAIS OU
EXTRAJUDICIAIS EM CONFORMIDADE COM O PROTOCOLO ADICIONAL À CONVENÇÃO
INTERAMERICANA                                                SOBRE CARTAS
ROGATÓRIAS**

FORMULÁRIO

A

CARTA ROGATÓRIA 1

| 1 ÓRGÃO JURISDICIONAL REQUERENTE<br>Nome: Tribunal Distrital dos E.U.A, distrito sul da Flórida.<br>Endereço: MMa Juíza Ursula M. Ungaro<br>Tribunal Federal de Miami<br>Avenida N. Miami, 301<br>Miami, FL, 33128 | 2 QUERELANTE: Comissão de Valores Mobiliários<br><br>\v.<br><br>RÉU: Fabrizio Neves<br><br>PROCESSO No: 1:12-cv-23131-UNGARO |
|---|---|
| 3 AUTORIDADE CENTRAL DO ESTADO REQUERENTE<br>Nome: Gabinete de Assistência Judiciária Internacional<br>Endereço: Divisão Civil, Ministério da Justiça<br>Edifício Todd, sala 1234<br>Rua 11, 550, N.O<br>Washington, D.C., 20530 | 4 AUTORIDADE CENTRAL DO ESTADO REQUERIDO<br>Nome: Ministério da Justiça<br>Endereço: Esplanada dos Ministérios<br>bl. T, 4º Andar, sala 424,<br>70000-900, Brasilia, DF<br>BRASIL |
| 5 PARTE REQUERENTE<br>Nome: Comissão de Valores Mobiliários dos E.U.A<br>Endereço: Avenida Brickell, 801<br>Sala 1800<br>Miami, FL, 33131 | 6 PROCURADOR DA PARTE REQUERENTE<br><br>Nome: N/A<br><br>Endereço: |

**PESSOA DESIGNADA PARA INTERVIR NO DILIGENCIAMENTO**

Nome: Edward D. McCutcheon, Esq.          Esta pessoa responderá  pelas custas e despesas?

Endereço: Comissão de Valores Mobiliários   SIM ☐   NÃO ☑
Avenida Brickell, 801  Sala 1800
Miami, FL, 33131                            Se não, um cheque na importância de $25.00 será anexado.
                                           (Ou comprovante de pagamento)

¹ Preencher o original e duas vias deste formulário. Se o item A (1) for aplicável, anexar o original e duas cópias da tradução deste item para o idioma oficial do Estado requerido.

1

A Autoridade Central que assina esta carta rogatória tem a honra de transmitir a Vossa Senhoria, em três vias, os documentos abaixo relacionados e, em conformidade com o Protocolo Adicional à Convenção Interamericana sobre Cartas Rogatórias:

* A.  Solicita sua pronta notificação a:

Fabrizio Neves

QI7, Conjunto 4, casa 10, Lago Sul Brasília - FF, CEP 71615-240

A autoridade infra-assinada solicita que a notificação seja feita da seguinte forma:

* (1) De acordo com o procedimento especial ou as formalidades adicionais abaixo indicadas, com fundamento no segundo parágrafo do artigo 10 da mencionada Convenção.

* (2) Mediante notificação pessoal à pessoa a quem se dirige, ou ao representante legal da pessoa jurídica.

* (3) No caso de não ser encontrada a pessoa natural ou o representante legal da pessoa jurídica que deva ser notificada, far-se-á a notificação na forma prevista pela lei do Estado requerido.

* B.    Solicita a entrega dos documentos abaixo relacionados à autoridade judiciária ou administrativa a seguir indicada:

Autoridade:_____

* C.    Pede à Autoridade Central do Estado requerido que devolva à Autoridade Central do Estado requerente uma via dos documentos juntos a esta carta rogatória, abaixo relacionados, e um certificado de cumprimento conforme o disposto no Formulário C em anexo.

Feito em _____ no dia _____de _____ de 20_____.

_____                      _____

Assinatura e selo do                                              Assinatura e selo da
órgão jurisdicional do                                          Autoridade Central do
Estado requerente                                                Estado requerido

Título ou outra identificação de cada um dos documentos que devam ser entregues:

Convocação, ordem para definir o planejamento inicial e conferência de programação.

(Anexar folhas adicionais se necessário)
* Eliminar se não for cabível.

2

## ANEXO AO PROTOCOLO ADICIONAL À CONVENÇÃO INTERAMERICANA SOBRE CARTAS ROGATÓRIAS

INFORMAÇÃO ESSENCIAL PARA O NOTIFICADO[1]

FORMULÁRIO B

A (Nome e endereço do notificado) Fabrizio Neves

Q17, Conjunto 4, casa 10, Lago Sul Brasília-FF, CEP 71615-240

Pela presente, comunica-se a Vossa Senhoria que (breve explicação sobre a notificação)
Uma ação judicial foi apresentada contra a Vossa Senhoria no Tribunal Distrital dos Estados Unidos, Distrito Sul da

Flórida, alegando violações das leis de valores mobiliários dos Estados Unidos da América.

Acompanha este documento uma cópia da carta rogatória que motiva a notificação ou entrega destes documentos. Esta cópia inclui informação essencial para a Vossa Senhoria. Além disso, juntam-se cópias da petição com que se iniciou o procedimento no qual se expediu a carta rogatória, dos documentos juntos à referida petição e das decisões jurisdicionais que ordenaram a expedição da carta rogatória.

## INFORMAÇÃO ADICIONAL
### I*
### PARA O CASO DE NOTIFICAÇÃO

A.   O documento que lhe é entregue consiste em (*original ou cópia*):
Queixa, o que inicia uma ação judicial contra Fabrizio Neves. Convocação, o que estabelece o prazo para responder a ação
judicial. Ordem para definir o planejamento inicial e conferência de programação, o que estabelece que
ambas as partes devem comparecer perante o tribunal na sexta-feira, 2 de novembro de 2012, às 10:00 horas.

B.   As pretenções ou a quantia do processo são as seguintes:
Se a Vossa Senhoria deixar de responder, um julgamento padrão será emitido aos fins de obter o alívio buscado na queixa.

C.   Nesta notificação, solicita-se a Vossa Senhoria que:
Apresente a resposta à queixa, a qual deve ser servida a querelante em 21 dias do serviço de Queixa e da Convocação.

D.   * No caso de citação do réu, pode este contestar o pedido perante o órgão jurisdicional indicado no quadro 1 do Formulário A (*indicar local, data e hora*):
A resposta à queixa deve ser servida a querelante em 21 dias do serviço da Queixa e da Convocação.

* Vossa Senhoria é citado para comparecer como: réu em matéria civil.

---

[1] Preencher o original e duas vias deste formulário no idioma do Estado requerente e duas cópias no idioma oficial do Estado requerido.
* Eliminar se não for cabível.

3

\*     No caso de solicitar-se outra coisa ao notificado, queira indicar:

_____

_____

_____

E.    Caso Vossa Senhoria não compareça, as conseqüências poderiam ser:

um julgamento padrão será emitido aos fins de obter o alívio buscado na queixa. _____

_____

F.    Informa-se a Vossa Senhoria que há a sua disposição advogado de ofício, ou sociedade de assistência judiciária no lugar do processo.

    Nome:

    _____

    Endereço:

    _____

    Os documentos enumerados na Parte III são entregues a Vossa Senhoria, para seu conhecimento e defesa.

## II \*
## PARA O CASO DE PEDIDO DE INFORMAÇÃO
## DE ÓRGÃO JURISDICIONAL

A:_____

_____

_____

*(Nome e endereço do órgão jurisdicional)*

Solicita-se respeituosamente prestar ao órgão infra-assinado a seguinte informação.

_____

_____

_____

Os documentos enumerados na Parte III são entregues a Vossa Senhoria para facilitar sua resposta.

\* Eliminar se não for cabível.

4

## III
## LISTA DOS DOCUMENTOS ANEXOS

Convocação [Inglês]

Convocação[Português]

Queixa [Inglês]

Queixa[Português]

Ordem para definir o planejamento inicial  e  conferência de programação  [Inglês]

Ordem para definir o planejamento inicial  e  conferência de programação  [Português]

*(Anexar folhas adicionais se necessário)*

Feito em _____ no dia _____de _____ de 20_____.

_____

Assinatura e selo do
órgão jurisdicional do
Estado requerente

_____

Assinatura e selo da
Autoridade Central do
Estado requerido

5

## ANEXO AO PROTOCOLO ADICIONAL À CONVENÇÃO
## INTERAMERICANA SOBRE CARTAS ROGATÓRIAS

FORMULÁRIO C

CERTIFICADO DE CUMPRIMENTO[1]

A:_____

_____

*(Identidade e endereço do órgão jurisdicional que expediu a carta rogatória)*

Em conformidade com o Protocolo Adicional à Convenção Interamericana sobre Cartas Rogatórias, assinado em Montevidéu, em 8 de maio de 1979, e com a carta rogatória original em anexo, a Autoridade Central infra-assinada tem a honra de certificar o seguinte:

*A.   Que se fez a notificação ou se procedeu à entrega de uma via dos documentos anexos a este Certificado, como se segue:

Data:_____

Local (*endereço*):_____

Em conformidade com um dos seguintes métodos autorizados pela Convenção.

* (1) De acordo com o procedimento especial ou formalidades adicionais que se indicam a seguir, com fundamento no segundo parágrafo do artigo10 da mencionada Convenção.

_____

_____

_____

* (2) Mediante notificação pessoal à pessoa a quem se dirige, ou ao representante legal da pessoa jurídica.

* (3) Não tendo sido encontrada a pessoa que devia ter sido notificada, fez-se a notificação na forma prevista pela lei do Estado requerido (e*specificar método utilizado*):

_____

_____

_____

_____

---

[1] Preencher o original e duas vias deste formulário no idioma oficial do Estado requerido.
* Eliminar se não for cabível.

\* B.   Que os documentos mencionados na carta rogatória foram entregues a:
Identidade da pessoa_____

_____

Relação com o destinatário _____
(*de família, de negócios ou de outra natureza*)

_____

\* C.   Que não se fez a notificação ou que não se procedeu à entrega dos documentos
pelos seguintes motivos:

_____

_____

\* D   Em conformidade com o Protocolo, solicita-se ao interessado que efetue o
pagamento do saldo a liquidar indicado no demonstrativo em anexo.

Feito em _____ no dia _____de _____ de 20_____.
(*Assinatura e selo da Autoridade Central do Estado requerido.*)


Quando cabível, anexar original ou cópia
de qualquer documento adicional necessário para
provar que se fez a notificação ou entrega, e
identificar o citado documento.


\* Eliminar se não for cabível.



51 East 42nd Street, Suite: 1406, New York, NY 10017
1-888-677-LINK (5465)  |  info@link-translations.com

www.link-translations.com

**TO WHOM THIS MAY CONCERN**
**STATEMENT CERTIFYING PROFESSIONAL TRANSLATION**

Link-Translations provides professional translation services. We have translated the attached document(s) titled:

- Summons In a Civil Action

From:  ENGLISH
Into:  PORTUGUESE

employing a team of professional and experienced translators who have a fluent knowledge of both languages.

We edited the translated text for meaning, accuracy and consistency with the original source text, and we proofread the translated text for spelling and grammatical accuracy.

We hereby certify that to the best of our knowledge, the translation that we have provided is an accurate and faithful translation of the original text provided to us.

Linda Lin
Link Translations, Inc.

State of New York
County of New York

SWORN TO BEFORE ME THIS
4th    day of  October  , 2012

HASAN ALKAN
NOTARY PUBLIC STATE OF NEW YORK
QUALIFIED IN NEW YORK COUNTY
LIC. #01AL6217991
COMMISSION EXPIRES 02/22/2014

(Notary Public)

#21046

AO 440 (REV. 06/12) Summons in a Civil Action

# TRIBUNAL DISTRITAL DOS ESTADOS UNIDOS

### para o

### Distrito Sul da Flórida

| | | |
|---|---|---|
| **COMISSÃO DE VALORES MOBILIÁRIOS,** | ) | |
| _____ | ) | **12-CV-23131-UNGARO/TORRES** |
| **Querelante** | ) | **Ação Civil nº** |
| **v.** | ) | |
| **FABRIZIO NEVES e JOSÉ LUNA,** | ) | |
| _____ | ) | |
| **Réus** | ) | |

## CITAÇÃO EM UMA AÇÃO CIVIL

**Para:** *(nome e endereço do réu)* **Fabrizio Neves**

### 1710 S. Miami Ave.

### Miami, FL, 33129

Uma ação judicial foi apresentada contra você.

Dentro de 21 dias após a notificação desta citação (não contando o dia em que você a recebeu) - ou 60 dias, se você é os Estados Unidos ou uma Agência dos Estados Unidos, ou um funcionário ou empregado descrito no Fed. R. Civ.P12 (a) (2) ou (3) - Você deve servir ao querelante, uma resposta para a queixa em anexo ou uma moção em acordo com a Regra 12 das Regras Federais de Processo Civil.  A resposta ou moção deve ser servida ao querelante ou seu advogado, cujo nome e endereço são:

Edward McCutcheon, Esq.
Comissão de Valores Mobiliários
801 Brickell Ave. Suite 1800
Miami, FL, 33131
Tel: (305) 982-6380

Se você não responder, um  julgamento por padrão será entrado contra você  para o alívio exigido nesta denúncia. Você também deverá apresentar a sua resposta ou moção com o tribunal.

Data: August 29, 2012

**CITAÇÃO**

Steven M. Larimore                     Juan Ulacia

Secretário do Tribunal             Vice-Secretário

Tribunal Distrital E.U

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

#### Southern District of Florida

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| FABRIZIO NEVES, and JOSE LUNA | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

Civil Action No.   12-CV-23131-UNGARO/TORRES

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Fabrizio Neves
1710 S. Miami Ave.
Miami, FL 33129

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Edward D. McCutcheon, Esq.
Securities and Exchange Commission
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone:  (305) 982-6380

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



**SUMMONS**

Date:  **August 29, 2012**

Steven M. Larimore
Clerk of Court

s/ Juan Ulacia
Deputy Clerk
U.S. District Courts



51 East 42nd Street, Suite 1406, New York, NY 10017
1-888-677-LINK (5465)   |   info@link-translations.com

www.link-translations.com

## TO WHOM THIS MAY CONCERN
## STATEMENT CERTIFYING PROFESSIONAL TRANSLATION

Link-Translations provides professional translation services. We have translated the attached document(s) titled:

- Complaint for Injunctive and Other Relief

From:   ENGLISH
Into:   PORTUGUESE

employing a team of professional and experienced translators who have a fluent knowledge of both languages.

We edited the translated text for meaning, accuracy and consistency with the original source text, and we proofread the translated text for spelling and grammatical accuracy.

We hereby certify that to the best of our knowledge, the translation that we have provided is an accurate and faithful translation of the original text provided to us.

Linda Lin
Link Translations, Inc.

State of New York
County of New York

SWORN TO BEFORE ME THIS
4th   day of October , 2012

HASAN ALKAN
NOTARY PUBLIC STATE OF NEW YORK
QUALIFIED IN NEW YORK COUNTY
LIC. #01AL6217991
COMMISSION EXPIRES 02/22/2014

(Notary Public)

#21046

TRIBUNAL DISTRITAL DOS ESTADOS UNIDOS

DISTRITIO SUL DA FLÓRIDA

CASO nº

| | |
|---|---|
| COMISSÃO DE VALORES MOBILIÁRIOS, | ) |
| Querelante | ) |
| v. | ) |
| FABRIZIO NEVES    e | ) |
| JOSÉ LUNA, | ) |
| Réus. | ) |

## QUEIXA DE MEDIDA CAUTELAR

A Comissão de Títulos e Câmbio, a querelante,  alega o seguinte:

### I.INTRODUÇÃO

1.     Entre Novembro de 2006 e Setembro de 2009, os réus Fabrizio Neves e José Luna  estavam envolvidos em um esquema fraudulento de marcação de preços de cerca de 70 milhões em notas estruturadas emitidas por vários bancos comerciais, cobrando cerca de 36 milhões em taxas excessivas reservadas a seus clientes de corretagem: dois fundos de pensão públicos brasileiros e um investidor institucional colombiano . Neves e Luna eram ambos representantes registrados e associados com a extinta corretora  LatAm Investments, LLC ("LatAm") em Miami, Florida.

2.     Em oito transações feitas entre julho de 2008 e setembro de 2009, Neves negociou a estruturação das notas em nome de seus clientes. Os bancos emitiram as notas estruturadas por um determinado preço e Neves as comprou  à esse mesmo preço usando a conta de negociação da LatAm.  Mas Neves não vendeu as notas diretamente aos clientes com o preço do emitente. Em vez disso, Neves primeiro negociou  as notas com uma ou mais contas de mandatários que  ele, Luna e outros controlavam. Neves, com a ajuda de Luna,  recomprou as notas destas contas de mandatários usando a conta de

negociação da LatAm à preços drasticamente mais altos, o que resultou em lucros extraordinários para Neves, Luna e os outros que controlavam as contas de mandatários. Por fim, Neves e Luna aumentaram os preços das notas estruturadas outra vez, e arranjaram para que os fundos brasileiros, ou, em um caso, o investidor institucional colombiano, comprassem as notas à preços 67 por cento mais altos do que os preços que os bancos haviam emitido.

3.      Em outras quatro transações feitas entre Novembro de 2006 e Maio de 2007, Neves e Luna indevidamente impulsionaram os preços das notas em majorações excessivas de até 36 por cento à mais do que os preços a que os bancos haviam emitido as notas estruturadas naquele mesmo dia, e logo depois, as venderam para os fundos brasileiros.

4.      Como resultado do esquema de majoração criado pelos réus, fundos brasileiros pagaram um total de aproximadamente US $ 24 milhões em taxas excessivas não reveladas, e o investidor institucional colombiano pagou mais de US $ 12 milhões em taxas excessivas também não reveladas.

5.      Através de sua conduta, os réus violaram o artigo 10 (b) da Lei da Comissão de Valores Mobiliários de 1934 ("Lei de Letra deCâmbio"), 15 U.S.C. § 78j (b), e a Regra da Lei de Letra de Câmbio 10b-5, 17 C.F.R. § 240.10b-5, Seção 17 (a) da Lei de Títulos de 1933 ("Lei de Títulos"), 15 USC §77q (a). Eles também ajudaram e incentivaram a LatAm à cometer violações da Lei de Letra de Câmbio , Seção 15 (c), 15 U.S.C. § 78o (c). A não ser que o Tribunal ordene os réus, eles provavelmente continuarão à violar essas leis.

## II. RÉUS

6.      Neves, de 43 anos, é um cidadão e residente brasileiro que mantém uma residência em Miami, Flórida. Entre Maio de 2006 e Novembro de 2009, Neves foi parte proprietário e representante registrado e associado da LatAm. Neves comprou a participação de 1 por cento na LatAm por

US$350,000, mas tinha a intenção de adquirir uma participação de 75 por cento. Neves também possui 90 por cento da Atlântica Administradora de Recursos Ltda., também conhecida como Atlântica Investimentos ("Atlantica Asset Management"), que é uma organização brasileira, não-registrada que atua como empresa de gestão de portfólio. Neves possui a Série 7 e 66 licenças de valores mobiliários. Em Maio de 2010, a FINRA proibiu Neves de se associar com qualquer empresa membro da FINRA baseado na sua incapacidade de fornecer documentos solicitados no âmbito da investigação da FINRA à respeito de algumas das condutas que são objetos das alegações desta denúncia.

7.    Luna, de 45 anos, reside em Aventura, Flórida. Em Maio de 2006, Neves contratou Luna para se juntar à LatAm como empregado de operações de back-office. Em Maio de 2008, Luna obteve sua licença Série 7 e, posteriormente, trabalhou como Gerente de Operações na América Latina, ajudando Neves no comércio em nome dos dois fundos brasileiros, até sua saída em Dezembro de 2009.

### Relevância da Entidade

8.    A LatAm é uma companhia de responsabilidade limitada da Flórida formada em 2004. Durante o período em causa na presente reclamação, LatAm teve Miami, Florida como o seu principal local de negócios. A empresa foi registrada como uma corretora em Outubro de 2004 sob o nome de Acosta Financial Services, Inc., e mudou seu nome para LatAm em Outubro de 2007. A LatAm arquivou um formulário BD-W, retirando o seu registro junto à SEC,o que passou à ser eficaz em 27 de Abril de 2010.

### III. JURISDIÇÃO E FORO

9.    Em conexão com o comportamento censurado a esta denúncia, os réus, direta e indiretamente, individualmente ou em conjunto com outros, já fizeram uso dos meios ou instrumentos de comércio interestadual, os meios ou instrumentos de transporte e comunicação no comércio interestadual e de emails. Mais especificamente, Neves negociou os termos das notas estruturadas utilizando o telefone

para se comunicar com os banqueiros localizados em Nova York, Londres, Inglaterra, e outros lugares fora da Flórida. Em pelo menos um caso, Neves recebeu o termo de compromisso de uma nota estruturada por email, nota esta a qual depois foi fraudulentamente vendida a um dos três clientes. Luna enviou os termos de compromisso forjados para um destinatário no Brasil via email e participou com Neves, em pelo menos uma das chamadas telefônicas para negociar os termos das notas estruturadas que são objeto das alegações da presente demanda. Além disso, Neves e Luna transferiram recursos de e para algumas das contas usadas para majorar os preços das notas em várias das operações descritas nesta denúncia.

10.    O Tribunal tem jurisdição sobre esta ação nos termos dos artigos 20 (d) e 22 (a) da Lei de Valores Mobiliários, 15 USC § § 77T (d) e 77V (a), e Secções 21 (d) e 27 da Lei deCâmbio, 15 USC § § 78u (d) e 78aa.

11.    O Tribunal tem jurisdição pessoal sobre os réus, e o Distrito Sul da Flórida é o local apropriado, porque muitos dos atos e transações dos acusados que constituem violações da Lei de Valores Mobiliários e da Lei de Câmbio ocorreram no Distrito Sul da Flórida, como descrito ao longo dessa queixa. Neves e Luna residiam no Distrito Sul da Flórida durante o período da conduta alegada. Além disso, a LatAm era uma sociedade de responsabilidade limitada da Flórida, tendo durante o período das alegações nesta denúncia, como o seu principal local de negócios, o Distrito Sul da Flórida.

### IV. O ESQUEMA FRAUDULENTO DE INVESTIMENTO DOS RÉUS

#### a. Relação dos réus entre si e com a LatAm

12.    Em maio de 2006, Neves ingressou na LatAm como um representante registrado e adquiriu a participação de 1 por cento de propriedade da empresa. Naquela época, Neves também era dono da Atlântica Administradora de Recursos Ltda, uma consultora de investimentos brasileira. A Atlântica

Administradora de Recursos Ltda atuou como gerente de portfólio para o Fundo Soberano do Brasil II FIDEX ("Fundo Soberano do Brasil ") e para o Fundo Soberano Real Atlântica ("Fundo Atlântica ") (coletivamente, os "Fundos Brasil") e, como tal, foi autorizada à tomar todas as decisões de negociação em nome dos fundos.  O patrocinador dos fundos brasileiros é o Postalis, o fundo de pensão dos trabalhadores dos correios no Brasil.  Neves era amigo de um funcionário de alto cargo do Postalis. Os fundos brasileiros eram clientes de corretagem de Neves desde 2005, antes dele se juntar à LatAm. Neves trouxe os fundos brasileiros com ele à LatAm como clientes.  Assim, através do seu papel na Atlântica Administradora de Recursos Ltda, Neves tinha poder sobre as contas dos dois fundos de pensão públicos ao mesmo tempo enquanto também servindo de representante registrado na Latam.

**13.**    Os fundos brasileiros imediatamente se tornaram os maiores clientes da LatAm e geraram a grande maioria dos lucros da empresa através da negociação de títulos e notas estruturadas. Antes de Neves trazer o negócio dos fundos brasileiros para a LatAm, os lucros da empresa eram mínimos: apenas 34,803 dólares em 2005. Após o ingresso de Neves na empresa e do início de negociações  para os fundos brasileiros, a LatAm registrou lucros de aproximadamente 58,7 milhões de dólares entre 1 de Janeiro de 2007 e 30 de novembro de 2009.

**14.**    Neves e Luna se conheceram em 2003, quando Neves começou a trabalhar em outra corretora onde Luna estava empregado. Em cerca de 2005, Neves deixou a corretora e contratou Luna para trabalhar para ele com o processamento das operações dos fundos brasileiros. Quando Neves saiu e comprou um interesse na LatAm em 2006, ele contratou Luna para ajudá-lo lá com operações de back office.  Depois que se juntou à LatAm, Neves também causou LatAm a contratar três dos seus sócios brasileiros como parceiros estrangeiros.  Os três, todos eles residentes no Brasil, também foram associados com a Atlântica Administradora de Recursos Ltda.

b. <u>Transações de notas estruturadas de 2006 e 2007 , envolvendo a majoração de preços no mesmo dia</u>

15.     Em uma típica transação de nota estruturada, o cliente solicita que o corretor-revendedor personalize uma nota com um emitente, normalmente um banco de investimentos, para atender às necessidades específicas daquele cliente. A emissora prepara um termo de compromisso que define os termos relevantes da transação, incluindo informações de preços. O termo de compromisso contém o que é referido, de formas variadas, dependendo do emissor, como um valor de referência, valor do principal, ou valor nominal (doravante denominado "valor nocional"). O preço de venda do emissor é calculado como uma percentagem do valor de referência da nota. A corretora normalmente compra a nota em sua conta principal pelo preço de venda do emitente e, em seguida, a vende para o cliente. A comissão do corretor, em conexão com a transação da nota estruturada é refletida em uma marcação ou redução de preços (se o cliente da corretora estiver vendendo) adicionada ao preço do título.

16.     Em pelo menos quatro transações de notas estruturadas que ocorreram em nome dos fundos brasileiros entre Novembro de 2006 e Maio de 2007, Neves cobrou taxas excessivas no mesmo dia das marcações. (Ver à seguir , a tabela detalhando as quatro transações). Especificamente, a  LatAm, sob a direção de Neves, adquiriu cada uma das notas estruturadas diretamente do emissor em conta principal sem risco da firma e, no mesmo dia, vendeu a nota para um dos fundos do Brasil com o preço marcado entre 18 e 36 por cento.

| No. ISIN e Valor Nocional ("VN") | Data de Transações | Preço de Compra LatAm (%do VN) | Preço de venda ao Cliente (% do VN) | Percentagem de remarcação | Marcação total |
|---|---|---|---|---|---|
| XS0275931607 $10,000,000 | 14/14/2006 | 50.89 por cento | 60 por cento | 18 por cento | $910,950 |
| XS0283887486 $12,000,000 | 17/01/2007 | 53 por cento | 64 por cento | 21 por cento | $1,319,950 |
| US105756AL40 $12,000,000 | 04/04/2007 | 70 por cento | 95 por cento | 36 por cento | $3,000,000 |
| XS0304195026 $7,500,000 | 29/05/2007 | 80 por cento | 100 por cento | 25 por cento | $1,500,000 |

*Linda*

17.     Neves não tinha base razoável para majorar tanto os preços das notas. Suas marcações foram excessivas, porque: (1) Neves fez as marcações no mesmo dia em que o emissor definiu o preço, (2) não havia mercado secundário para as notas, e (3) não houve nenhum evento interveniente significativo do mercado naquele dia. As taxas cobrada dos Fundos brasileiros no mesmo dia, nestas quatro transações, resultaram em um excesso de encargos de aproximadamente US $ 6,7 milhões.

### c.   Transações Fraudulentas de notas estruturadas
### envolvendo contas de mandatários em 2008 e 2009

18.     Em oito transações feitas entre julho de 2008 e setembro de 2009, Neves utilizou uma ou mais contas de mandatários no exterior como intermediários para gerar as marcações excessivas (e em uma transação, uma redução de preço excessivo). As contas intermediárias usadas nas oito transações intermediárias foram controladas por Neves, Luna, seus parentes ou sócios. Em cada operação, Neves primeiro negociou os termos das notas estruturadas com os emissores, como o solicitado pelos fundos brasileiros ou o investidor institucional semi-público colombiano, a Corporación Autónoma Regional de Valle del Cauca ("CVC"). Uma vez que Neves finalizou os termos das notas, ele as comprou em conta de capital sem risco da LatAm. Depois disso, Neves mandou Luna preencher notas para comerciar sete das notas com uma ou mais contas offshore de mandatários , que mantiveram as notas por curtos períodos de tempo, antes de vendê-las de volta para LatAm a um preço majorado selecionado por Neves. As contas intermediárias que Neves, Luna e seus associados controlavam receberam lucros inesperados a partir da rápida revenda das notas à preços majorados que Neves definiu. Neves e Luna então, executaram as vendas das notas em conta de capital sem risco da LatAm para os fundos brasileiros ou a CVC, à preços entre 19 e 67 por cento mais elevados do que o preço que o emissor havia fixado.

**19.**     Em um exemplo, no dia 06 de julho de 2009, Neves comprou uma nota estruturada com número ISIN XS0439509240 e um montante nocional de 10,000 mil dólares a um preço de 37 por cento do valor nocional da nota. Ele comprou a nota em conta de negociaçãoda LatAm.  No mesmo dia, Neves e Luna executaram a revenda da nota para Rio Consulting, Inc., a um preço de 47 por cento do seu valor nocional.  Rio Consulting Inc. era uma empresa de fachada constituída nas Ilhas Virgens Britânicas. A empresa foi registrada sob o nome da sogra de Neves , mas ele é a que  a controlava.

**20.**     Em 24 de julho de 2009, Luna e Neves executaram a revenda da nota de 06 julho de 2009 por Rio Consulting Inc. para LatAm ao preço de 59,95 por cento do seu valor nocional.  No mesmo dia, Neves e Luna executaram a venda da nota da conta da LatAm para um dos fundos brasileiros à um preço de 60 por cento do seu valor nocional.  Nesta operação, o Fundo Brasileiro pagou 6,000 mil dólares pela nota, incluindo uma marcação de 62 por cento de US $ 2,300.000. A conta da Rio Consulting Inc., empresa de Neves, lucrou cerca de US $ 1,300.000.

**21.**     Neves e Luna usaram a Rio Consulting Inc. como intermediária em cinco das oito transações que envolviam contas intermediárias.  Estas cinco transações envolviam notas estruturadas emitidas em: Julho de 2009, com ISIN número XS0439509240, descrito acima, julho de 2009, com um valor nocional de $ 3,000.000 com ISIN número XS0439257766; julho de 2009, com um valor nocional de 12 milhões de dólares americanos com número ISIN número XS0295805708; agosto de 2009, com um valor nocional de 8,5 milhões de dólares com  ISIN número XS0445230781 e agosto de 2009, com um valor nocional, em reais, R$ 53,747.700 com  ISIN número XS0449348688. Neves e Luna aumentaram os preços dessas cinco notas estruturadas para incluir marcações excessivas  e reduções não reveladas, e um desconto entre 19 e 67 por cento. Neves e Luna cobraram as marcações e remarcações para os fundos brasileiros.

**22.**     Em duas das oito transações que envolviam pelo menos um intermediário, Neves e Luna usaram uma conta offshore em nome de Spectra Holding Group, Ltd. para esconder marcações excessivas em

duas notas: uma emitida em Julho de 2008, com um valor nominal de 7,168 milhões de dólares com ISIN número XS0378810823 e outra emitida em agosto de 2009 com o ISIN número XS0449348688, como descrito no parágrafo anterior. Spectra Holding era uma corporação das Ilhas Virgens Britânicas registrada sob uma entidade chamada Spectra Trust. O instituidor e principal beneficiário do Spectra Trust é também um oficial sênior da Postalis (o mesmo oficial referido no parágrafo 12, acima), a patrocinadora dos fundos brasileiros.

23.    As outras duas transações fraudulentas usando contas intermediárias envolvem  notas estruturadas emitidas em novembro de 2008 com um valor nominal de $ 50,000.000 com o número ISIN,SX0401826754 e dezembro de 2008 com um valor nominal de US $ 10,000.000 com o número ISIN SX0402114200.

d. <u>Para esconder o esquema de majoração, Neves e Luna  forjaram</u>

<u>termos de compromisso dos clientes</u>

24.    Em pelo menos seis casos, Neves e Luna esconderam o esquema de majoração excessiva, alterando os termos de compromisso originais fornecidos à LatAm pelo emitente das notas, ou seja, inflando o preço original ou removendo completamente a informação dos preços.  Neves disse a Luna que preços usar, e fazia com que os preços dos termos de compromissos alterados e da nota à ordem correspondessem, e aprovou as alterações antes de que  Luna enviasse para os representantes dos fundos brasileiros ou na véspera.  Luna usava corretivo líquido ou  "cortar e colar" para alterar ou omitir informações de fixação de preços dos termos de compromisso.

25.    Por exemplo, Luna enviou por email à Atlântica Asset Management,  gestora do Fundo Atlântica, um termo de compromisso alterado para a nota de 6 de julho de 2009, descrita acima, que deturpou o preço de emissão  de 60 por cento do seu valor nocional.  Atlântica Asset Management, por sua vez,

forneceu uma cópia do termo de compromisso com o preço de 60 por cento para o administrador dos

fundos brasileiros.  O termo de compromisso original do emitente, no entanto, tinha listado o preço de

emissão de 37 por cento do seu valor nocional.  Neves e Luna alteraram a informação de preços do

termo de compromisso do administrador dos fundos brasileiros para esconder o preço menor  da nota

estruturada em questão.

26.     Em outro exemplo, sob a direção Neves, Luna mudou a informação original de preços do termo

de compromisso e enviou esse termo de compromisso alterado  à Atlântica Asset Management para

uma nota estruturada em reais,  emitida em 25 de agosto de 2009, como descrito acima. O termo de

compromisso que  Luna alterou e transmitiu, inflou o preço da nota original de 27,91 por cento do seu

valor nocional em reais à 47,5 por cento do seu valor nocional em reais.  Em um terceiro exemplo,

Neves, comandou Luna à alterar um termo de compromisso para uma nota emitida em 24 de novembro

de 2008, com um valor nocional de US $ 50,000.000, para que ele contesse um preço de emissão de

53,27 por cento do valor nocional.  O termo de compromisso original do emissor da nota enviada a Luna

incluía um preço de emissão de 32,90 por cento do valor nocional da nota.  Neves e Luna alteraram o

termo na véspera.

### e. Os réus receberam milhões em ganhos ilícitos através de seu esquema

27.     Durante o período da fraude acima descrita ,a LatAm pagou Neves milhões de dólares em

comissões de vendas infladas das transações de notas estruturadas realizadas a preços inflacionados.

Durante o mesmo período, Luna recebeu centenas de milhares de dólares em salários e comissões da

LatAm,  e dezenas de milhares de dólares em compensação adicional que Neves lhe pagou de uma outra

empresa controlada por Neves.

### V.   DEDUÇÃO DE PEDIDOS

### PEDIDO I

### Fraude em violação da secção 10 (b) e Regra 10b-5 da Lei de Letra de Câmbio

#### (Contra Ambos os réus)

**28.** A Comissão reitera e reapresenta os parágrafos 1 à 27 da sua denúncia.

**29.** Desde 2006, Neves e Luna, direta ou indiretamente, pelo uso de meios e instrumentos do comércio interestadual, e de correspondências em conexão com a compra ou venda de valores mobiliários, consciente ou inconscientemente: (a) utilizaram dispositivos, esquemas ou artifícios para fraudar, (b) fizeram declarações falsas sobre fatos relevantes e omitiram fatos materiais necessários à fim de tornar as declarações feitas, à luz das circunstâncias sob as quais foram feitas, em não enganosas, ou (c) estavam envolvidos em atos, práticas e cursos de negócios que haviam operado, estão operando ou irão operar como uma fraude sobre os compradores desses títulos.

**30.** Em razão do exposto, os réus, direta ou indiretamente violaram, e, se portanto, não forem intimados, poderão continuar a violar a Seção 10 (b) da Lei de Valores Mobiliários, 15 USC § 78j (b), e Regra da Lei de Valores Mobiliários Lob-5, 17 C.F.R. § 240.10b-5.

#### PEDIDO II

### Fraude em violação da Seção 17 (a) (I) da Lei de Valores Mobiliários

#### (Contra Ambos os réus)

**31.** A Comissão reitera e reapresenta os parágrafos 1 à 27 da sua denúncia.

**32.** Desde 2006, Neves e Luna, direta ou indiretamente, pelo uso dos meios ou instrumentos de transporte ou de comunicação no comércio interestadual e pelo uso de correspondências, na oferta ou venda de valores mobiliários, conforme descrito na denúncia, usaram esquemas ou artifícios conscientemente e de forma imprudente com a intenção de cometer fraude.

**33.**    Em razão do exposto, os réus, direta ou indiretamente violaram, e se portanto não forem

intimados, poderão  continuar a violar a Seção 17(a)(l) da Lei de Valores Mobiliários 15 U.S.C. §

77q(a)(1).


### PEDIDO III

#### Fraude em violação da Seção 17 (a) (2) e (3) da Lei de Valores Mobiliários

#### (Contra Ambos os réus)

**34.**    A Comissão reitera e reapresenta os  parágrafos 1 à 27 da sua denúncia.

**35.**     Desde  2006, Neves e Luna, direta ou indiretamente, na oferta ou venda de valores mobiliários,

com a utilização de meios,  instrumentos de transporte ou de comunicação no comércio interestadual, e

de correspondências: (a) obteram dinheiro ou propriedade  por meio de declarações falsas de fato

relevante ou omitindo os fatos materiais necessários, a fim de tornar as declarações feitas, à  luz das

circunstâncias em que foram feitas, não enganosas e (b) estavam envolvidos em atos, práticas e cursos

de negócios que haviam operado, estão operando ou irão operar como uma fraude sobre os

compradores desses títulos.

**36.**    Em razão do exposto, os réus, direta ou indiretamente violaram, e se portanto não forem

intimados, poderão  continuar a violar as  Seções 17(a)(2) e (3) da Lei de Valores Mobiliários, 15 U.S.C.

§§ 77q(a)(2) and (3).


### PEDIDO IV

#### Cumplicidade nas violações da LatAm em relação à Seção 15 (c) da Lei de Valores Mobiliários

#### (Contra Ambos os réus)

**37.**    A Comissão reitera e reapresenta os  parágrafos 1 à 27 da sua denúncia.

**38.**     Desde 2006, Neves e Luna ajudaram  e instigaram as  violações que a LatAm Investments LLC

cometeu  da Seção 15 da Lei de Valores Mobiliários (c), 15 USC § 78o (c), usando correspondências e

instrumentos de comércio interestadual para efetuar transações e para induzir ou tentar induzir a

compra ou venda de valores mobiliários: (a) por meio de um dispositivo manipulador, ou outro artifício

fraudulento, e (b) em conexão com a qual LatAm Investments LLC se envolveu em  atos  ou práticas

fraudulentas.

**39.**     Em razão do exposto, Neves e Luna ajudaram e instigaram nas  violações cometidas por LatAm

Investments LLC e, a menos que eles sejam intimados, será razoavelmente provável que continuem

adireta ou indiretamente a violar a Seção 15 (c) da Lei de Valores Mobiliários, 15 USC § 78o (c).

## REPARAÇÃO SOLICITADA

Portanto, a Comissão pede respeitosamente que o Tribunal:

### I.

### Alívio declaratório

Declare, determine, e descobra que os réus cometeram as violações das leis federais de valores

mobiliários alegadas neste Reclamação.

### II.

### Medida Cautelar Permanente

Emita injunções permanentes nos termos do artigo 65 (d) das Normas Federais de Processo Civil:

ordenar os réus, seus agentes, empregados, advogados, representantes, e todas as pessoas em ligação

ou participação ativa com eles, e cada um deles, de direta ou indiretamente, ter violado a Seção 10 (b)

da Lei de Valores Mobiliários , 15 USC § 78j (b), e  Regra da Lei de Valores Mobiliários 10b-5, 17 C.F.R. §

240,1 Ob-5, Seção 17 (a) da Lei de Valores Mobiliários, 15 USC § 77q (a) e Artigo 15 (c) da Lei de Valores

Mobiliários, 15 USC § 78o (c).

III.

## Restituição

Emita uma ordem direcionando os réus à devolver todos os ganhos ilícitos, incluindo juros anteriores ao

julgamento, resultante de atos ou de cursos de conduta alegada nesta denúncia.

IV.

## Penalidades

Emita uma ordem direcionando os réus à pagar multas em dinheiro de acordo com a Seção 20 (d) da Lei

de Valores Mobiliários, 15 USC § 77T (d), e Seção 21 (d) da Lei de Valores Mobiliários, 15 USC § 78 (d)

(3).

V.

## Alívio adicional

Conceda este alívio e outros mais,  se for necessário e adequado.

VI.

## Retenção de Jurisdição

Além disso, a Comissão pede respeitosamente que o Tribunal retenha  jurisdição sobre esta ação, a fim

de implementar e executar os termos de todas as ordens e decretos que podem entrar, ou para entreter

qualquer aplicação adequada ou movimento pela Comissão para alívio adicional no âmbito da jurisdição desta Corte.

Respeitosamente,

29 de Agosto de 2012

Edward D. McCutcheon

Advogado Sênior

Ordem dos Advogados da Flórida nº 683841

Tel: (305) 982-6380

E-mail: mccutcheone@sec.gov

Procurador Geral

Laura R. Smith

Advogada Sênior

SDFL CM/ECF ID: A5501349

Ordem dos Advogados da Califórnia nº 205159

Tel: (305) 982-6387

Email: smithla@sec.gov

*Advogados da Querelante*

COMISSÃO DE VALORES MOBILIÁRIOS

801, Avenida Brickell , Suite 1800

Miami, Florida  33131

Tel: (305) 982-6300

Fax:  (305) 536-4154

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| FABRIZIO NEVES and | ) |
| JOSE LUNA, | ) |
| | ) |
| Defendants. | ) |
| ———————————————————— | ) |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission alleges as follows:

## I.  INTRODUCTION

1.      From November 2006 to September 2009, Defendants Fabrizio Neves and Jose Luna engaged in a scheme to fraudulently mark up prices of approximately $70 million in structured notes issued by major commercial banks, charging approximately $36 million in undisclosed excessive fees to their brokerage customers: two Brazilian public pension funds and a Colombian institutional investor. Neves and Luna were both registered representatives associated with the now-defunct Miami, Florida broker-dealer LatAm Investments, LLC ("LatAm").

2.      In eight transactions between July 2008 and September 2009, Neves negotiated the structuring of the notes on his customers' behalf. The banks issued the structured notes at a certain price and Neves purchased them at that price into LatAm's trading account. But Neves did not directly sell the notes to the customers at or close to the issuer's price. Instead, Neves first traded the notes with one or more nominee accounts he, Luna and others controlled. Neves,

with Luna's assistance, then repurchased the notes from these nominee accounts into LatAm's trading account at dramatically increased prices, resulting in windfall profits to Neves, Luna, and the others who controlled the nominee accounts. Finally, Neves and Luna marked up the prices of the structured notes again, and arranged for the Brazilian Funds or, in one instance, the Colombian institutional investor, to purchase the notes at prices as much as 67 percent over the prices at which the banks had issued them.

3.      In four other transactions between November 2006 and May 2007, Neves and Luna improperly boosted the prices of the structured notes by selling them to the Brazilian funds at excessive markups up to 36 percent more than the prices at which the banks had issued the notes that same day.

4.      As a result of the Defendants' markup scheme, the Brazilian funds paid a total of approximately $24 million in undisclosed, excessive fees and the Colombian institutional investor paid more than $12 million in undisclosed, excessive fees.

5.      Through their conduct, the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5; Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a).   They also and aided and abetted LatAm's violations of Exchange Act Section 15(c), 15 U.S.C. § 78o(c).   Unless the Court enjoins the Defendants, they are reasonably likely to continue to violate these laws.

## II. DEFENDANTS

6.      **Neves**, age 43, is a Brazilian citizen and resident, and maintains a residence in Miami, Florida.   From approximately May 2006 until November 2009, Neves was a part owner of and registered representative associated with LatAm.   Neves originally purchased a 1

percent ownership interest in LatAm for $350,000, though he intended to acquire a 75 percent interest. Neves also owns 90 percent of Atlantica Administradora De Recursos Ltda., a/k/a Atlantica Investimentos ("Atlantica Asset Management"), a non-registered, Brazilian-based portfolio management company. Neves held Series 7 and 66 securities licenses. In May 2010, FINRA barred Neves, by consent, from association with any FINRA member firm in any capacity based on his failure to provide requested documents in connection with FINRA's investigation of some of the conduct alleged in this complaint.

7.      **Luna**, age 45, resides in Aventura, Florida. In May 2006, Neves hired Luna to join LatAm as a back office operations employee. In May 2008, Luna obtained his Series 7 license and subsequently worked as Operations Manager at LatAm, assisting Neves in trading on behalf of the two Brazilian funds, until he left in December 2009.

**Relevant Entity**

8.      **LatAm** is a Florida Limited Liability Company formed in 2004. During the period at issue in this complaint, LatAm had its principal place of business in Miami, Florida. LatAm was registered as a broker-dealer in October 2004 under the name Acosta Financial Services, Inc., and changed its name to LatAm in October 2007. LatAm filed a Form BD-W, withdrawing its registration with the SEC, effective on April 27, 2010.

**III.     JURISDICTION AND VENUE**

9.      In connection with the conduct alleged in this Complaint, the Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails. More specifically, Neves negotiated the terms of the structured notes using the telephone to communicate with bankers located in New York, London,

England, and other places outside of Florida. In at least one instance, Neves received by email a term sheet for a structured note later fraudulently sold to one of the three customers. Luna emailed the forged term sheets to a recipient in Brazil and participated with Neves in at least one of the telephone calls to negotiate the terms of the structured notes that are the subject of the allegations of this complaint. In addition, Neves and Luna caused funds to be transferred by wire to and from certain of the accounts used to mark up the notes' prices in several of the transactions described in this complaint.

10.     The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(d) and 77v(a); and Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

11.     The Court has personal jurisdiction over the Defendants, and venue is proper in the Southern District of Florida, because many of the Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida, as described throughout this complaint. Neves and Luna resided in the Southern District of Florida during the period when the alleged conduct occurred. In addition, LatAm was a Florida limited liability company with its primary place of business in the Southern District of Florida during the period the allegations in this complaint occurred.

## IV.  THE DEFENDANTS' FRAUDULENT INVESTMENT SCHEME

### a.  The Defendants' Relationship With Each Other And LatAm

12.     In May 2006, Neves joined LatAm as a registered representative and acquired a 1 percent ownership interest in the firm. At that time, Neves also was an owner of Atlantica Asset Management, a Brazilian investment adviser. Atlantica Asset Management served as the portfolio manager for the Brazil Sovereign II FIDEX Fund ("Brazil Sovereign Fund") and the

Atlantica Real Sovereign Fund ("Atlantica Fund") (collectively, "the Brazilian Funds") and, as such, was authorized to make all trading decisions on behalf of the funds. The sponsor of the Brazilian Funds is Postalis, a pension fund for postal workers in Brazil. Neves was friends with a senior officer of Postalis. The Brazilian Funds were Neves' brokerage customers since at least 2005, before he joined LatAm. Neves brought the Brazilian Funds with him to LatAm as customers. Thus, through his role with Atlantica Asset Management, Neves had discretion over the two public pension funds' accounts while also serving as the accounts' registered representative at LatAm.

13.     The Brazilian Funds immediately became LatAm's largest customers and generated the vast majority of the firm's revenues through the trading of bonds and structured notes. Before Neves brought the Brazilian Funds' business to LatAm, the firm's revenues were minimal: only $34,803 in 2005. After Neves joined the firm and began trading for the Brazilian Funds, LatAm reported revenues of approximately $58.7 million from January 1, 2007 through November 30, 2009.

14.     Neves and Luna met in 2003 when Neves began working at another broker-dealer where Luna was employed. In about 2005, Neves left that broker-dealer and hired Luna to work for him processing trades for the Brazilian Funds. When Neves left and bought an interest in LatAm in 2006, he hired Luna to assist him there with back office operations. After he joined LatAm, Neves also caused LatAm to hire three Brazilian associates of his as foreign associates. The three, all of whom were Brazilian residents, also were associated with Atlantica Asset Management.

**b.  <u>Structured Note Transactions in 2006 and 2007 Involving Same Day Excessive Markups</u>**

15.     In a typical structured note transaction, the customer requests that the broker-

dealer customize a note with an issuer, typically an investment bank, to meet the customer's particular needs.   The issuer prepares a term sheet setting forth the relevant terms of the transaction, including pricing information.   The term sheet contains what is referred to, variously, depending on the issuer, as a notional amount, principal amount, or nominal amount (hereinafter "notional amount").   The issuer's sale price is calculated as a percentage of the note's notional amount.   The broker-dealer typically will purchase the note into its firm's riskless principal account at the issuer's sale price and then sell it to the customer.   The broker-dealer's commission in connection with the structured note transaction is reflected in a markup or markdown (if the broker-dealer's customer is selling) added to the price of the security.

16.    In at least four structured note transactions on behalf of the Brazilian Funds between November 2006 and May 2007, Neves charged undisclosed excessive same-day markups.  (See table detailing the four transactions, below).  Specifically, LatAm, at Neves' direction, purchased each of the structured notes directly from the issuer into the firm's riskless principal account and, on the same day, sold the note to one of the Brazilian Funds with the price marked up between 18 and 36 percent.

| ISIN # and Notional Amount ("NA") | Date of Transactions | LatAm's Purchase Price (percent of NA) | Sale Price to Customer (percent of NA) | Markup percent | Total Markup Amount |
|---|---|---|---|---|---|
| XS0275931607 $10,000,000 | 11/14/2006 | 50.89 percent | 60 percent | 18 percent | $910,950 |
| XS0283887486 $12,000,000 | 1/17/2007 | 53 percent | 64 percent | 21 percent | $1,319,950 |
| US105756AL40 $12,000,000 | 4/4/2007 | 70 percent | 95 percent | 36 percent | $3,000,000 |
| XS0304195026 $7,500,000 | 5/29/2007 | 80 percent | 100 percent | 25 percent | $1,500,000 |

17.    Neves had no reasonable basis to mark up the prices of the notes that much.  His markups were excessive because: (1) Neves made the markups on the same day the issuer set the

price; (2) there was no secondary market for the notes; and (3) there were no significant intervening market events that day.  The same-day markups charged to the Brazilian Funds in these four transactions resulted in undisclosed excess charges of approximately $6.7 million.

        **c.**   **Fraudulent Structured Note Transactions in 2008 and 2009 Involving Nominee Accounts**

18.     In eight transactions between July 2008 and September 2009, Neves used one or more accounts of offshore nominee entities as intermediaries to generate the excessive markups (and in one transaction, an excessive markdown).   The intermediary accounts used in the eight intermediary transactions were controlled by Neves, Luna, or their relatives or associates.  In each transaction, Neves first negotiated the terms of the structured notes with the issuers, as requested by the Brazilian Funds or the quasi-public Colombian institutional investor, the Corporacion Autonoma Regional de Valle del Cauca ("CVC").  Once Neves finalized the terms of the notes, he purchased them into LatAm's riskless principal account.  Thereafter, Neves directed Luna to fill out order tickets to trade seven of the notes with one or more offshore nominee accounts, who held the notes for short periods of time, before selling the notes back to LatAm at a marked up price Neves selected.  The intermediary accounts Neves and Luna or their associates controlled received windfall profits from the quick re-sale of the notes at the marked up prices Neves set.   Neves and Luna then executed sales of the notes from LatAm's riskless principal account to the Brazilian Funds or the CVC at prices between 19 and 67 percent higher than the price the issuer had set.

19.     In one example, on July 6, 2009 Neves purchased a structured note with ISIN # XS0439509240 and a $10,000,000 notional amount at a price of 37 percent of the note's notional amount.  He purchased the note into LatAm's trading account.  That same day, Neves and Luna executed the re-sale of the note to River Consulting, Inc. at a price of 47 percent of its

notional amount.  River Consulting is a shell company incorporated in the British Virgin Islands.
The company is registered in the name of Neves' mother-in-law and he controlled it.

20.    On July 24, 2009, Neves and Luna executed the re-sale of the July 6, 2009 note
by River Consulting to LatAm at price of 59.95 percent of its notional amount.  That same day,
Neves and Luna executed a sale of the note from LatAm's account to one of the Brazilian Funds
at a price of 60 percent of its notional amount.  In this transaction, the Brazilian Fund paid
$6,000,000 for the note, including a 62 percent markup of $2,300,000.  Neves' River Consulting
account profited by nearly $1,300,000.

21.    Neves and Luna used River Consulting as an intermediary in five of the eight
note transactions involving intermediary accounts.  These five transactions involved structured
notes issued in: July 2009 with ISIN # XS0439509240, described above; July 2009, with a
notional amount of $3,000,000 with ISIN Number XS0439257766; July 2009, with a notional
amount of $12,000,000 with ISIN Number XS0295805708; August 2009, with a notional
amount of $8,500,000 with ISIN number XS0445230781; and August 2009, with a notional
amount, in Brazilian reals, of R$53,747,700 with ISIN number XS0449348688.  Neves and Luna
marked up the prices of these five structured notes to include undisclosed excessive markups,
and a markdown, of between 19 and 67 percent.  Neves and Luna charged the markups and
markdown to the Brazilian Funds.

22.    In two of the eight transactions involving at least one intermediary, Neves and
Luna used an offshore account in the name of Spectra Group Holding, Ltd. to conceal excessive
markups on two notes: one issued in July 2008 with a notional amount of $7,168,000 with ISIN
number XS0378810823; the other issued in August 2009 with ISIN number XS0449348688, as
described in the previous paragraph.  Spectra Holding was a British Virgin Islands corporation

registered to an entity named Spectra Trust.  The settlor and primary beneficiary of the Spectra Trust is also a senior officer of Postalis (the same officer referred to in paragraph 12, above), the sponsor of the Brazilian Funds.

23.     The other  two  fraudulent  transactions  using  intermediary  accounts  involved structured notes issued in November 2008 with a notional amount of $50,000,000 with ISIN number SX0401826754; and December 2008 with a notional amount of $10,000,000 with ISIN number SX0402114200.

### d.  To Conceal The Markup Scheme, Neves And Luna Provided Forged Term Sheets To Customers

24.     In at least six instances, Neves and Luna  concealed the excessive markup scheme by altering the original term sheets provided to LatAm by the notes' issuers, either by inflating the original price, or removing the pricing information altogether.  Neves told Luna what prices to use, made sure the price on the altered term sheet and the order ticket matched, and approved the alterations before Luna sent them to the Brazilian Funds representatives or the CVC.   Luna used "white out" or electronic "cut and paste" to change or omit the original term sheets' pricing information.

25.     For example, Luna emailed Atlantica Asset Management, the manager  for  the Atlantica  Fund,  an  altered  term  sheet  for  the  July 6,  2009  note  described  above  that misrepresented  the  issue  price  was  60  percent  of  its  notional  amount.   Atlantica  Asset Management, in  turn,  provided  a  copy  of  the  term  sheet  with  the  60  percent  price  to  the administrator for the Brazilian Funds.  The issuer's original term sheet, however, had listed the issue price as 37 percent of its notional amount.  Neves and Luna altered the pricing information on the term sheet to conceal the structured note's lower issue price from the Brazilian Funds' administrator.

26.     In another example, at Neves' direction, Luna changed the original term sheet pricing information and sent an altered term sheet to Atlantica Asset Management for a Brazilian real denominated structured note issued on August 25, 2009, as described above.  The term sheet Luna altered and transmitted inflated the note's original issue price from 27.91 percent of its notional amount in Brazil reals to 47.5 percent of its notional amount in reals.   In a third example, Neves directed Luna to alter a term sheet for a note issued on November 24, 2008, with a notional amount of $50,000,000, so it contained an issue price of 53.27 percent of the notional amount.  The original term sheet the note's issuer sent to Luna includes an issue price of 32.90 percent of the note's notional amount.  Neves and Luna provided the altered term sheet to the CVC.

### e.   The Defendants Received Millions in Ill-Gotten Gains From Their Scheme

27.     During the period the above-described fraud was ongoing, LatAm paid Neves millions of dollars in inflated sales commissions for the structured note transactions made at inflated prices.  During the same period, Luna received hundreds of thousands of dollars in salary and commissions from LatAm, and tens of thousands of dollars in additional compensation Neves paid him from a company Neves controlled.

## V.  CLAIMS FOR RELIEF

## COUNT I

### Fraud In Violation of Section 10(b) and Rule 10b-5 of the Exchange Act
### (Against Both Defendants)

28.     The Commission repeats and realleges paragraphs 1 through 27 of its  Complaint.

29.     Starting no later than 2006, Neves and Luna directly or indirectly, by use of the

means and instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

30.    By reason of the foregoing, the Defendants directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule l0b-5, 17 C.F.R. § 240.10b-5.

## COUNT II

### Fraud In Violation of Section 17(a)(1) of the Securities Act
**(Against Both Defendants)**

31.    The Commission repeats and realleges paragraphs 1 through 27 of its Complaint.

32.    Starting no later than 2006, Neves and Luna directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly or recklessly employed devices, schemes or artifices to defraud.

33.    By reason of the foregoing, the Defendants directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(l) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### Fraud In Violation of Section 17(a)(2) and (3) of the Securities Act
**(Against Both Defendants)**

11

34.     The Commission repeats and realleges paragraphs 1 through 27 of its Complaint.

35.     Starting no later than 2006, Neves and Luna directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails: (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

36.     By reason of the foregoing, the Defendants directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and (3).

## COUNT IV

### Aiding and Abetting LatAm's Violations of Section 15(c) of the Securities Exchange Act
### (Against Both Defendants)

37.     The Commission repeats and realleges paragraphs 1 through 27 of its Complaint.

38.     Starting no later than 2006, Neves and Luna aided and abetted LatAm Investments LLC's violations of Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c), by using the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities: (a) by means of a manipulative, deceptive, or other fraudulent device or contrivance, and (b) in connection with which LatAm Investments LLC engaged in a fraudulent deceptive, or manipulative act or practice.

39.     By reason of the foregoing, Neves and Luna aided and abetted LatAm Investments LLC's violations and, unless they are enjoined, are reasonably likely to continue to directly or indirectly violate Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c).

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine, and find that the Defendants have committed the violations of the federal securities laws alleged in this Complaint.

### II.

### Permanent Injunctive Relief

Issue permanent injunctions pursuant to Rule 65(d) of the Federal Rules of Civil Procedure enjoining: the Defendants, their agents, servants, employees, attorneys, representatives, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5; Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c).

### III.

### Disgorgement

Issue an Order directing the Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## IV.

### Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3).

## V.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VI.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

August 29, 2012                              By: _____
                                             Edward D. McCutcheon
                                             Senior Trial Counsel
                                             Florida Bar No. 683841
                                             Direct Dial: (305) 982-6380
                                             E-mail: mccutcheone@sec.gov
                                             *Lead Attorney*

                                             Laura R. Smith
                                             Senior Counsel
                                             SDFL CM/ECF ID: A5501349
                                             California Bar No. 205159
                                             Direct Dial: (305) 982-6387
                                             Email: smithla@sec.gov

*Attorneys for Plaintiff*
**SECURITIES AND EXCHANGE**
**COMMISSION**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154



51 East 42nd Street, Suite: 1406, New York, NY 10017
1-888-677-LINK (5465)  |  info@link-translations.com

www.link-translations.com

**TO WHOM THIS MAY CONCERN**
**STATEMENT CERTIFYING PROFESSIONAL TRANSLATION**

Link-Translations provides professional translation services. We have translated the attached document(s) titled:

- Order

From:   ENGLISH
Into:     PORTUGUESE

employing a team of professional and experienced translators who have a fluent knowledge of both languages.

We edited the translated text for meaning, accuracy and consistency with the original source text, and we proofread the translated text for spelling and grammatical accuracy.
We hereby certify that to the best of our knowledge, the translation that we have provided is an accurate and faithful translation of the original text provided to us.

Linda Lin
Link Translations, Inc.

State of New York
County of New York

SWORN TO BEFORE ME THIS
4th   day of October , 2012

HASAN ALKAN
NOTARY PUBLIC STATE OF NEW YORK
QUALIFIED IN NEW YORK COUNTY
LIC. #01AL6217991
COMMISSION EXPIRES 02/22/2014

(Notary Public)

#21046

TRIBUNAL DISTRITAL DOS ESTADOS UNIDOS
DISTRITIO SUL DA FLÓRIDA
CASO nº 12-23131-CV-UNGARO

COMISSÃO DE VALORES MOBILIÁRIOS,

Querelante

v.

FABRIZIO NEVES     e

JOSÉ LUNA,

Réus.

_____

ORDEM PARA DEFINIR O PLANEJAMENTO INICIAL E CONFERÊNCIA DE PROGRAMAÇÃO

Esta ordem de planejamento inicial e conferência de agendamento está marcada para ser discutida em frente a Meritíssima Juíza Ursula Ungaro, no tribunal dos Estados Unidos, localizado na Avenida Miami Norte, nº 400, 12 andar, sala de audiência nº 4, Miami, Flórida, na sexta-feira, 16 de novembro de 2012 às 10:00. Os advogados da querelante foram instruídos a fornecer cópias desta ordem a todos os outrosadvogados envolvidos neste caso e para qualquer um dos partidos não representados que possam surgir no caso. De acordo com os termos da Fed.R.Civ.P. 26 (t) e regra local 16.1B, ambas as partes são co-responsáveis por conferir e desenvolver um plano de descoberta, e além disso,terão que apresentar e servir um planejamento conjunto e relatório de programação, juntamente com uma proposta ordem de agendamento, e uma lista de serviços em anexo, incluindo os nomes das partes, números de telefone e números de fax. O relatório e a proposta ordem deverão ser apresentados no dia 2 DE NOVEMBRO DE 2012 e deverão recitar o seguinte:

1. Uma simples declaração sobre a natureza da ação judicial e qualquer reconvenção, reivindicação cruzada e ação de terceiros , incluindo o montante da indemnização pedida e qualquer outro alívio solicitado.

2. Um breve resumo dos fatos que não são contestados e que podem ser estipulados sem descoberta.

3. Um breve resumo das questões atualmente conhecidas.

4. Se a descoberta deverá ser realizada em fases ou limitada a questões específicas.

5. Uma programação detalhada da descoberta para cada parte.

6. Prazos propostos para apensação de outras partes e de alterar os fundamentos para apresentar , ouvir propostas e  completar a descoberta.

7. Propostas datas para conferências de pré-julgamento e julgamento.

8. O tempo previsto necessário para o julgamento e uma declaração de que o caso é julgamento com júri ou sem júri.

9. Uma lista de todos as moções pendentes, se cada moção estiver "madura" para a revisão, a data em que cada moção tornou-se madura, e um resumo das posições das respectivas partes, com relação a cada moção madura.

10. Qualquer aspecto único de direito ou fato do caso que exijam atenção especial por parte do Tribunal.

11. Qualquer necessidade potencial de obter referências de  um mestre especial ou magistrado.

12. O estado e a probabilidade de um acordo

13.  Outros assuntos que são exigidos pela Regra Local 16,1 (B) e como podem auxiliar o Tribunal na definição do status do caso ou conferência  de pré-julgamento e na administração e justa disposição expedita desta ação.

SERVIÇO DE PROCESSO

Não obstante as disposições da Regra Federal de Processo Civil 4, a querelante é ordenada a servir e

apresentar declarações de serviço em nome de todos os réus prontamente e no mais tardar 14 dias

antes da conferência de planejamento e programação.  No caso em que algum réu permaneça sem ser

atendido até essa data, a querelante deverá  incluir no planejamento conjunto e relatório de

programação  uma explicação detalhada o suficiente para mostrar um bom motivo para a falta de

citação. Se a querelente não fornecer uma explicação suficiente, o réu  será dispensado da ação sem

aviso prévio.

INFORMAÇÕES ARMAZENADAS ELETRONICAMENTE

Se as partes prevêem que a informação armazenada eletronicamente ("IAE") será relevante para as

acusações e defesas das partes, elas devem participar de discussões e chegar a um plano, que é

proporcional e razoável em relação à natureza e complexidade do caso , para a preservação,

identificação e produção de  IAE. O plano deve ser apresentado separadamente ao Tribunal no

momento da apresentação da ordem de agendamento proposta para aprovação do Tribunal.

Na formulação de um plano, as partes devem incluir, se necessário para o caso, a sua estipulação sobre

a especificação dos formatos em que os documentos estão a ser produzidos, os campos de metadados,

os métodos pelos quais os documentos sensíveis serão identificados, os procedimentos que serão

empregados para proteger alegações de privilégio, e outros requisitos , condições ou disposições que as

partes acreditam que são necessárias para facilitar e acelerar a descoberta de documentos  de IAE.

Com relação às divulgações iniciais exigidas pela Fed. R. Civ. P. 26 (a) (l) - (2), nos termos do artigo 26 (a),

as divulgações devem ser feitas antes ou no momento das partes conferirem ao desenvolvimento do

plano de descoberta. As partes devem comprovar no relatório de programação conjunta que tais

revelações foram feitas a menos que um partido objete durante a conferência que a divulgação requerida  não é apropriada nas circunstâncias da ação e os arquivos de uma objeção à divulgação específica com o Tribunal. Tais objeções deve ser apresentadas no prazo de quinze (15) dias antes do planejamento inicial e conferência de programação e deve incluir uma explicação completa sobre a base das acusações.

No caso de moções estarem pendentes no Tribunal  no momento da conferência, as partes devem estar preparadas para argumentar, a critério do Tribunal, os méritos destas moções.

**Se por acaso o Tribunal emitir uma ordem de agendamento antes do planejamento inicial e conferência de programação com base nas informações fornecidas pelas partes em seu planejamento conjunto e relatório de programação, o Tribunal notificará as partes se a Conferência será cancelada.**

FEITO e ORDENADO neste dia __5_ de setembro de 2012 em Miami, Flórida.


                              JUÍZA DISTRITAL DOS ESTADOS UNIDOS

CC: Advogados

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO: 12-23131-CV-UNGARO

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

v.

FABRIZIO NEVES and JOSE
LUNA,

       Defendants,

-------------------------------------------/

## ORDER SETTING INITIAL PLANNING AND SCHEDULING CONFERENCE

    **THIS CAUSE** is hereby set for an Initial Planning and Scheduling Conference before the

Honorable Ursula Ungaro, at the United States Courthouse, 400 N. Miami Avenue, 12th Floor,

Courtroom 4, Miami, Florida, on **Friday, NOVEMBER 16, 2012 at 10:00 A.M.**

    Counsel for the Plaintiff(s) is instructed to provide copies of this order to all counsel of

record and to any unrepresented parties that have appeared in the case.  Pursuant to Fed.R.Civ.P.

26(f) and Local Rule 16.1B, the parties are jointly responsible for conferring to develop a proposed

discovery plan; thereafter, the parties are to file and serve a Joint Planning and Scheduling Report,

together with a proposed Scheduling Order, and an attached service list including the parties' names,

phone numbers and facsimile numbers.  The report and proposed order must be filed by

**NOVEMBER 2, 2012** and must recite the following:

      1.     A plain statement of the nature of the claim and any counterclaims, cross-claims, or
           third-party claim, including the amount of damages claimed and any other relief
           sought.

      2.     A brief summary of the facts which are uncontested or which can be stipulated to

without discovery.

3.   A brief summary of the issues as presently known.

4.   Whether discovery should be conducted in phases or limited to particular issues.

5.   A detailed schedule of discovery for each party.

6.   Proposed deadlines for joinder of other parties and to amend the pleadings, to file and hear motions and to complete discovery.

7.   Proposed approximate dates for final pre-trial conferences and trial.

8.   The projected time necessary for trial and a statement of whether the case is jury or non-jury trial.

9.   A list of all pending motions, whether each motion is "ripe" for review, the date each motion became ripe, and a summary of the parties' respective positions with respect to each ripe motion.

10.   Any unique legal or factual aspects of the case requiring special consideration by the Court.

11.   Any potential need for references to a special master or magistrate.

12.   The status and likelihood of settlement.

13.   Such other matters as are required by Local Rule 16.1(B) and as may aid the Court in setting the case for status or pretrial conference and in the fair and expeditious administration and disposition of this action.

## SERVICE OF PROCESS

**Notwithstanding the provisions of Federal Rule of Civil Procedure 4, the Plaintiff is ordered to serve and file returns of service on all Defendants promptly and at least no later than 14 days prior to the Planning and Scheduling Conference. In the event any Defendant remains unserved by that date, Plaintiff must include in the Joint Planning and Scheduling Report a detailed explanation sufficient to show good cause for the failure to effect service. If Plaintiff fails to provide a sufficient explanation, the unserved Defendant will be dismissed from the action without further notice.**

## ELECTRONICALLY STORED INFORMATION

If the parties anticipate that electronically stored information ("ESI") will be relevant to the

2

parties' claims and defenses, they must engage in discussions and arrive at a plan, which is proportional and reasonable in relation to the nature and complexity of the case, for the preservation, identification, and production of ESI. The plan shall be separately submitted to the Court at the time of filing the proposed Scheduling Order for Court approval.

In formulating a plan, the parties shall include, if necessary to the case, their stipulation regarding the specification of the formats in which documents are to be produced, the metadata fields, if any, that will be requested, the methods by which responsive documents will be identified, the procedures they will employ to protect claims of privilege, and other requirements, conditions or provisions that the parties believe are necessary to facilitate and expedite ESI document discovery.

With respect to initial disclosures required under Fed. R. Civ. P. 26(a)(1)-(2), pursuant to Rule 26(a), the disclosures must be made at or before the time the parties confer to develop the discovery plan. The parties must certify in the Joint Scheduling Report that such disclosures have been made unless a party objects during the conference that the required disclosure(s) is not appropriate in the circumstances of the action and files an objection to the specific disclosure(s) with the Court. Such objections must be filed no later than fifteen (15) days prior to the Initial Planning and Scheduling Conference and must include a full explanation of the basis for the objections.

In the event that motions are pending before the Court at the time of the Conference, the parties shall be prepared to argue, at the Court's discretion, the merits of such motions.

**In the event the Court issues a Scheduling Order prior to the Initial Planning and Scheduling Conference based on the information provided by the parties in their Joint Planning and Scheduling Report, the Court will notify the parties whether the Conference will be canceled.**

3

**DONE AND ORDERED** this ___5___ day of September, 2012 at Miami, Florida.

**URSULA UNGARO**
**UNITED STATES DISTRICT JUDGE**

cc: all counsel of record